

# IN THE
## TENTH COURT OF APPEALS

### No. 10-11-00291-CR

**COREY STEWART,**

                                            **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                            **Appellee**

### From the 361st District Court
### Brazos County, Texas
### Trial Court No. 10-02913-CRF-361

## MEMORANDUM OPINION

Corey Stewart was convicted of capital murder and automatically sentenced to life in prison without parole because the State did not seek the death penalty. *See* TEX. PEN. CODE ANN. §§ 12.31(b), 19.03(a) (West 2011). Stewart complains that the trial court abused its discretion by denying his motion to suppress evidence because the initial traffic stop was improper, by denying his motion to suppress his statements because there was no express waiver of his rights given, that the evidence was insufficient to establish a specific intent to kill the victim, and the trial court abused its discretion in

the admission of evidence. Because we find no reversible error, we affirm the judgment of the trial court.

*Motion to Suppress Evidence*

Stewart complains that the trial court abused its discretion by denying a pretrial motion to suppress that challenged the validity of a traffic stop which led to the discovery of inculpatory evidence. Stewart filed a pre-trial motion to suppress evidence and statements made by him, which was denied after a hearing. Stewart complains that there was no reasonable suspicion to stop him because he did not commit a traffic offense and the officer that stopped him did not have reasonable suspicion of his involvement in criminal activity to justify the stop. The State argues that even though a traffic offense was later shown not to have occurred, the officer's mistaken belief that a traffic offense had occurred was reasonable, and therefore the stop was not improper. Alternatively, the State argues that the collective knowledge of the officers cooperating in the investigation and detention of Stewart was sufficient to constitute reasonable suspicion to justify the traffic stop.

*Standard of Review*

We evaluate a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). The trial judge is the sole trier of fact and judge of the weight and credibility of the evidence and testimony. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007). Accordingly, we

give almost total deference to the trial court's determination of historical facts if supported by the record. *Ford*, 158 S.W.3d at 493. But we review *de novo* the trial court's application of the law to those facts. *Id*. We give the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011). We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007).

Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in a criminal activity. *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007). The acts or circumstances need not be criminal themselves to create reasonable suspicion. *Woods*, 956 S.W.2d at 38. However, the facts must show unusual activity, some evidence that connects the detainee to the unusual activity, and some indication that the unusual activity is related to crime. *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011). We examine the totality of circumstances to determine whether Stewart's initial detention was reasonable and justified. *See Curtis v. State*, 238 S.W.3d 376, 380 (Tex. Crim. App. 2007); *Castro*, 227 S.W.3d at 741.

The detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists. *Derichsweiler*, 348 S.W.3d at 914. Also, information provided to police from a citizen-informant who identifies himself or herself and may be held to account for the accuracy and veracity of his or her report may be regarded as reliable. *Id*. at 914-15. *See Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011) (*citing Brother v. State*, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005)). In such a scenario, the only question is whether the information that the known citizen-informant provides objectively supports a reasonable suspicion to believe that criminal activity is afoot. *Derichsweiler*, 348 S.W.3d at 915.

### *Relevant Facts from the Suppression Hearing*

The victim, Kinny, was shot and killed during a robbery at an Exxon in College Station early in the morning. Multiple officers were dispatched to the scene to investigate and a mobile command center was set up nearby. Every officer would report their findings to that center. Sergeant Woodward was in charge of the investigation and was at the command center.

Two individuals had seen two men running from the Exxon in the direction of Stewart's residence. The video feed from the security cameras at the store showed that

the perpetrators were two black males, one that was stocky and the other thin. The video was viewed by many officers involved in the investigation.

Along the path between the Exxon and Stewart's residence, a bandana was found that may have been used in the robbery. Officers began knocking on doors and searching the nearby areas looking for evidence or people who might have seen something. The empty cashbox from the Exxon was discovered in a dumpster next to a white Lincoln Towncar. The dumpster and car were in front of the four-plex where Stewart lived with his girlfriend and her mother.

Detective Junek saw Stewart standing outside in the early afternoon of that same day and recognized that he fit the general description of the stocky male seen in the video footage. Junek approached Stewart and Stewart consented to having his picture taken and gave a DNA swab sample. Stewart did not consent to allow Junek into his residence and claimed that no one else was in the apartment. Junek left the area to continue his searching.

Approximately an hour and forty-five minutes after Junek left Stewart, Junek was informed by an unnamed witness that Stewart had been seen coming out of his apartment with a thin black male and that they had left in the white Lincoln. Junek thought this was suspicious because Stewart had told him that there was no one else in the apartment, which had only one entrance. Additionally, the description given of the

second male matched that of the shooter from the Exxon. Junek relayed this information to Woodward.

Early on the morning of the robbery and murder, Junek had been contacted by a detective from the Bryan Police Department regarding a robbery that had taken place at an Exxon in Bryan that involved a person being tied up, bound, locked into a room, and held at gunpoint that had occurred approximately four days before this robbery and murder. The Bryan detective forwarded photographs from that robbery to Junek's phone, but they were not connected to Stewart prior to Stewart's arrest.

Detective Lacox had received a tip that the suspects involved in the capital murder had been seen at Frankie's convenience store in the early afternoon. The suspects were seen in a white Lincoln with a blue bottom.

Detective Johse was tasked with contacting a person about a robbery that had occurred within a week of the robbery and murder of Kinny. Johse met with a woman who said her cousin and her brother had been robbed. The victims had not reported the offense and were afraid to speak with police because at least one of them had an active warrant for a traffic citation. However, Johse was able to make contact with Jessica Greeno and Devoris Harris who told Johse that three black males had robbed them the same week as the robbery and murder. One of the perpetrators was armed with a .22 revolver with a long barrel.

Greeno further informed Johse that about 30 minutes before she talked to him, she had seen the person who had the gun from her robbery at Frankie's Exxon, which was about a half-mile from the Exxon where the murder occurred. Greeno described the person as being 5' 7"-5' 8" tall and weighing between 220 and 230 pounds with short hair. She further stated that this person was driving a white and blue Lincoln with the license plate number of HCK 814. This information was relayed to Sergeant Woodward, and it was discovered that the license plate number of the white Lincoln from outside of Stewart's residence had a license plate number of HCK 841.

Greeno and Harris were shown still photos from the College Station Exxon robbery but could not identify anyone because they were grainy and black-and-white images taken from the security cameras. Greeno and Harris went to the police station and viewed the video in color. Greeno identified the stockier male from the video as the individual who had the gun during her robbery.

After receiving the information about Greeno and Harris, Woodward issued a "be on the lookout" alert, or "BOLO," for Stewart and the white Lincoln. The alert was received by Officer Mader, who was a relatively new patrol officer for the College Station police department. Mader had viewed the security video of the robbery and murder at the start of his shift that day and knew that the investigation was ongoing.

While on patrol, Mader spotted the white Lincoln and began pursuit. He asked for additional units to assist him and informed the dispatch operator that he had

located the Lincoln. Mader was advised not to stop the vehicle on a "suspicious person stop" and that a probable cause stop was needed, meaning a traffic violation or other offense. After Mader followed the vehicle for a couple of miles, the Lincoln turned into a liquor store parking lot. Although Stewart had signaled his intent to turn, Mader did not believe that the signal had been made more than 100 feet from the turn, which, if so, is a traffic offense. *See* TEX. TRANSP. CODE ANN. § 545.106. Mader made the decision to stop the Lincoln based on that alleged violation only. But it was later shown that Stewart had actually signaled for approximately between 129 and 153 feet prior to the turn.

*Analysis*

Because it is not necessary for the arresting officer to have reasonable suspicion personally and by reviewing the cumulative knowledge of the officers who were cooperating with the investigation of the robbery and murder as set forth above, using the appropriate standards, we find that the cumulative information available to the officers and specifically Woodward, the officer who issued the BOLO, constituted reasonable suspicion that Stewart had been involved in criminal activity. Because of this determination, we do not reach the issue of whether Mader's erroneous belief that Stewart committed a traffic violation was reasonable. Therefore, the trial court did not err by denying Stewart's motion to suppress because of an unlawful traffic stop. We overrule issue one.

*Motion to Suppress Statements*

In his second issue, Stewart complains that the trial court abused its discretion by denying his motion to suppress a statement he made in part on videotape because no express waiver of his rights was shown on that recording. The State argues that this objection was not made to the trial court, and therefore has not been preserved. Stewart does not refer to any specific statute he contends was violated in his brief to this Court, but briefly argues that an inaudible comment made on the recording was inadequate to constitute a sufficient express waiver of his rights. To the degree that Stewart is complaining that article 38.22 of the Code of Criminal Procedure was violated in that the police failed to obtain an express waiver on the recording of the oral statement itself, as required by section 3(a)(2), we agree that no objection was made to the trial court on this basis. *See* TEX. R. APP. P. 33.1(a); *Leza v. State*, 351 S.W.3d 344, 353 (Tex. Crim. App. 2011). Stewart's other complaints in this issue, if any, are inadequately briefed, and therefore waived. *See* TEX. R. APP. P. 38.1(i). We overrule issue two.

*Sufficiency of the Evidence*

In his third issue, Stewart complains that the evidence was insufficient for the jury to have found him guilty of capital murder because there was no specific intent to cause the death of the victim. The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light

most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson v. Virginia*, 443 U.S. at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d at 13. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

*Capital Murder*

A person commits capital murder if he intentionally causes the death of an individual while in the course of committing or attempting to commit robbery. TEX. PEN. CODE ANN. § 19.03(a)(2) (West 2011); *Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992), *cert denied*, 510 U.S. 852, 114 S. Ct. 154, 126 L. Ed. 2d 115 (1993); *Frank v. State*, 183 S.W.3d 63, 72 (Tex. App.—Fort Worth 2005, pet. ref'd). The law of parties applies to the offense of capital murder. *Johnson*, 853 S.W.2d at 534; *Frank*, 183 S.W.3d at 72.

Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PEN. CODE ANN. § 7.01(a); *Frank*, 183 S.W.3d at 72. A person is "criminally responsible" for an offense committed by the conduct of another, if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PEN. CODE ANN. § 7.02(a)(2); *Frank*, 183 S.W.3d at 72. Evidence is sufficient to convict under the law of parties when the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App.) (op. on reh'g), *cert. denied*, 519 U.S. 1030, 117 S. Ct. 587, 136 L. Ed. 2d 516 (1996); *Frank*, 183 S.W.3d at 72-73. In determining whether a defendant participated in an offense as a party, the factfinder

may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to commit the offense. *Ransom*, 920 S.W.2d at 302; *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985), *cert. denied*, 476 U.S. 1101, 106 S. Ct. 1942, 90 L. Ed. 2d 352 (1986); *Frank*, 183 S.W.3d at 73.

Further, section 7.02(b) of the penal code provides that

[i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PEN. CODE ANN. § 7.02(b).

The jury was instructed that it could find Stewart guilty of capital murder in any of three different ways: (1) as a principal; (2) as a party under section 7.02(a)(2) of the Texas Penal Code; and (3) as a co-conspirator under section 7.02(b) of the Texas Penal Code. The jury returned a general verdict; therefore, if the evidence is sufficient to support a guilty finding under any of the allegations submitted, we must uphold the jury's guilty verdict. *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

Stewart's complaint is limited to whether the evidence was sufficient to show that his accomplice had the specific intent to kill the victim. Therefore, our analysis and discussion of the facts will be limited to that issue.

Intent is most often proven through the circumstantial evidence surrounding the crime. *See Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Intent to kill may be inferred from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon. *See Ross v. State*, 861 S.W.2d 870, 873 (Tex. Crim. App. 1992). If a deadly weapon is used in a deadly manner, the inference is almost conclusive that the defendant intended to kill. *See Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986).

*Relevant Facts*

Stewart's accomplice, Joshua Evans, entered an Exxon in College Station to rob it armed with a loaded .22 caliber revolver. Stewart entered approximately ten seconds after Evans. Kinny, the victim, was a clerk at the store. The security camera footage showed that Evans pointed the revolver at Kinny when he saw Kinny. Kinny advanced toward Evans holding his hands up. Evans pulled the revolver to his side, with Kinny still coming toward him. When Kinny was close to Evans, Evans raised the revolver again and pointed it toward Kinny. Evans and Kinny scuffled and at some point, Kinny was shot by Evans. Kinny continued scuffling with Evans until he collapsed.

Stewart claimed that Kinny collapsed on top of Evans, and in an effort to get Kinny off of Evans, he may have "poked" Kinny with the knife he was carrying. Kinny suffered two stab wounds to his back, one of which was 2 inches deep, which the

medical examiner believed occurred after the shooting. Kinny died from the gunshot wound.

Stewart presented evidence that the revolver that was shown to be the murder weapon was old and in disrepair and would have been very difficult to fire.

Stewart argues that because Kinny continued advancing after Evans lowered the weapon to his side the first time and because there was some evidence presented at trial that the revolver might have malfunctioned due to its poor condition, the evidence was insufficient. However, our review of the record demonstrates that the jury could have determined beyond a reasonable doubt that Evans intended to kill Kinny. Evans brought a revolver loaded with hollow point bullets to the Exxon, and immediately pointed it at Kinny upon making contact with him. Although Evans did lower his arm, he raised it again as he was stepping aside to dodge Kinny's advances, which could reasonably have been viewed as an attempt to disarm Evans. There was evidence that Kinny could have been shot when Evans raised his arm the second time based on the trajectory of the bullet in Kinny's body. Stewart admitted that he knew that Evans carried a firearm with him everywhere he went in case he needed it. The jury was entitled to believe or disbelieve the testimony regarding whether or not the revolver discharged accidentally or intentionally. Viewing all of the evidence in a light most favorable to the verdict, we find that the evidence was sufficient for the jury to have found that Evans intended to kill Kinny. We overrule issue three.

*Admission of Evidence*

Stewart complains in his fourth issue that the trial court abused its discretion by taking judicial notice of the authenticity of multiple exhibits from testimony given at the trial of Evans, his accomplice. At a hearing outside of the presence of the jury, the State informed the trial court that there was an issue with certain items of evidence that had been admitted in the prior trial of Evans because the evidence bags were not available. The State did not specify to which exhibits it was referring. Stewart informed the trial court that he would be objecting to those items because there was no way to establish the chain of custody as to them. The trial court advised Stewart that he was taking judicial notice of the testimony authenticating the exhibits that had been given in Evans's trial, to which Stewart objected.

We have previously stated that "testimony from a previous trial cannot be considered by the trial judge at a subsequent trial unless it is admitted into evidence at the subsequent proceeding." *Davis v. State*, 293 S.W.3d 794, 797-98 (Tex. App.—Waco 2009, no pet.). Thus, to base the admission of evidence solely on the "recollection" of the trial court regarding the testimony from another proceeding is improper. However, the State argues that this issue has not been adequately briefed and that many of Stewart's apparent objections to the evidence were waived at trial.

Although Stewart refers to "photographs, the victim's bloody clothing, revolver, bullets, DNA swabs" in his brief to this Court, Stewart cites to only three places in the

record where he contends that evidence was erroneously admitted. No further description of the objectionable evidence was briefed. We will address the three record citations only. Any other complaints are inadequately briefed, and therefore waived. *See* TEX. R. APP. P. 38.1(i).

First, Stewart complains that the trial court abused its discretion in the admission of still photographs taken from the security video. However, those exhibits were offered into evidence the day before the trial court indicated that it would take judicial notice, and Stewart did not object on the basis of authentication when the exhibits were offered or when the witness was explaining what they portrayed. Therefore, Stewart's complaint regarding the photographs was not preserved, and was waived. *See* TEX. R. APP. P. 33.1(a).

Stewart's second reference to the record does not show any evidence being admitted nor did Stewart object during that segment of the record.

Third, Stewart objects to photographs that were admitted that were taken during a search of Stewart's residence. Stewart objected to the admission of the photographs "based on our previous objection." The photographs were described by an officer who participated in the search who testified that the photographs depicted the scene at the time of the search. Rule 901 requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901(a). These

photographs were properly authenticated prior to their admission, and the trial court did not abuse its discretion in admitting them. We overrule issue four.

*Conclusion*

Having found no reversible error, we affirm the judgment of the trial court.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed August 1, 2013
Do not publish
[CRPM]